IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| LCA-VISION, INC. d/b/a LASIKPLUS, *et al.*, | : | Case No. 1:19cv818 |
| | : | |
| Plaintiffs, | : | Judge Susan J. Dlott |
| | : | |
| v. | : | **ORDER DENYING PLAINTIFFS'** |
| | : | **MOTION FOR CONTEMPT,** |
| SANJAY DESH GOEL, M.D., | : | **DEFENDANT'S MOTION FOR** |
| | : | **SANCTIONS, AND PLAINTIFFS'** |
| Defendant. | : | **MOTION TO CONFIRM STAY** |
| | : | |

This matter is before the Court on Plaintiffs' Motion for Contempt (Doc. 30), Defendant's Motion for Sanctions (Doc. 51), and Plaintiffs' Motion to Confirm Stay of Discovery (Doc. 55). The opposing parties vehemently contest these motions (Docs. 37, 38, 53, 54, 56, 58, 59, 61), and the Court's efforts to mediate this matter (Doc. 43) have failed.

This litigation began as an action to enforce a restrictive covenant between an ophthalmologist licensed to perform laser vision correction procedures and his former employer. Although the parties reached a heavily negotiated settlement agreement and entered a Consent Judgment and Agreed Permanent Injunction (Doc. 26), this case descended into questionable conduct and competing motions for sanctions and contempt. For the reasons set forth below, all pending motions will be **DENIED**.

## I.    BACKGROUND

In 1999, Plaintiff LCA-Vision, Inc. hired Defendant Sanjay Desh Goel, an ophthalmologist, to perform Lasik surgery and related treatments on patients in Baltimore, Maryland. In 2007, Plaintiff Columbus Eye Associates, Inc., an affiliate or subsidiary of LCA-

Vision, Inc.,[1] entered into an employment agreement with Goel.  The agreement contained a restrictive covenant requiring Goel, among other things, not to deliver laser vision correction services in a specified geographic area (the "Restricted Area") for 18 months after he terminated his employment with LCA.

After nearly 20 years of employment, Goel grew disillusioned with LCA.  In March 2019, Goel and seven other physicians resigned from LCA.  The other seven physicians obtained employment with Vision Group Holdings ("VGH"), LCA's primary competitor at that time.[2]  On May 25, 2019, Goel informed LCA that he was opening his own practice in Maryland and would abide by the terms of the 2007 restrictive covenant.

On September 25, 2019, LCA initiated the instant action alleging that Goel breached the 2007 restrictive covenant.  Approximately one month later, the parties, as part of a larger settlement agreement, filed a Consent Judgment and Agreed Permanent Injunction ("Consent Judgment").  (Doc. 26.)  Pursuant to the Consent Judgment, the parties stipulated:

> 2.  For a period of 18 months beginning on June 20, 2019, Goel, his staff, his employees, his associated and affiliated optometrists and anyone else acting in concert with him or under his direction and control are prohibited from performing LASIK/PRK surgeries, including pre-operative and routine post-operative LASIK/PRK exams, with the exception of post-operative LASIK/PRK exams for the 36 patients for whom Goel has already performed LASIK/PRK surgery since June 20, 2019, within 30 miles of the following locations:  (a) 22 West Road, Suite 201, Towson Maryland; and (b) 10025 Governor Warfield Parkway, Suite 103, Columbia, Maryland (the "Restricted Area").

---

[1] In the interest of brevity, the Court will refer to LCA-Vision, Inc. and Columbus Eye Associates, Inc. collectively as "LCA."

[2] In addition to this action, LCA initiated litigation in Hamilton County, Ohio Court of Common Pleas alleging an "orchestrated mass resignation" in attempt to "devalue if not destroy LasikPlus and damage its reputation and position irreparably in the US LASIK market so that [VGH] can assume dominance of the US LASIK market." (Doc. 51 at PageID 1162–63 (quoting *LCA-Vision, Inc. v. Vision Group Holdings, LLC,* Case No. A-1901821 (Ham. Cty. Ohio C.P. 2019), Doc. 1).)  Ultimately, after litigation in Ohio and Florida, LCA purchased VGH's assets out of bankruptcy.

Nothing in this paragraph prohibits Goel from performing general ophthalmology exams or other non-LASIK/PRK surgeries, including corneal consultation, refractive lenses, cataract surgery, and posterior capsulotomy within the Restricted Area. . . .

Nothing in this paragraph prohibits Goel from discussing LASIK/PRK surgery as an option for general ophthalmology patients or referring a patient for LASIK/PRK surgery outside of the Restrict Area for evaluation of the patient as a possible candidate for LASIK/PRK surgery that may be performed by Goel outside of the Restricted Area on the conditions that: (1) the patient did not indicate the purpose of their requested evaluation by Goel in the Restricted Area relates to LASIK/PRK surgery . . . (2) Goel did not evaluate the patient within the Restricted Area with the purpose of performing a pre-operative LASIK/PRK correction examination; and (3) Goel does not perform the LASIK/PRK surgery or any associated evaluations, pre-operative, or post-operative exams within the Restricted Area. . . .

3. For a period of 18 months beginning on June 20, 2019, Goel is prohibited from advertising, whether via radio, television, website, social media or other medium or in any of his practice locations, that he is able to perform LASIK/PRK surgeries, including pre-operative and post-operative LASIK/PRK exams, within the Restricted Area.

Nothing in this paragraph prohibits Goel from advertising in any territory, including but not limited to the Restricted Area, that he is able to perform LASIK/PRK surgeries, including pre-operative and post-operative LASIK/PRK exams, outside of the Restricted Area. Provided, however, that any advertisements are explicit and prominent either that Goel is not performing LASIK/PRK in the Restricted Area or the location that Goel is performing LASIK/PRK outside the Restricted Area.

Notwithstanding the foregoing, Goel shall not advertise, publicize, list, or announce himself or his practice as providing LASIK/PRK surgeries or pre-operation exams in "Baltimore", in the "Baltimore Area", or in any other location within the Restricted Area.

(Doc. 26 at PageID 563–65.)

On November 1, 2019, Goel emailed LCA Chief Executive Officer ("CEO") Craig Joffe, stating:

> I am writing to make you aware that I plan on bringing "SMILE"
> laser eye surgery to Frederick/Baltimore.  As you may know,
> "SMILE" is an acronym for "Small Incision Lenticule Extraction"
> which is neither LASIK nor PRK.  None of the machines at
> LasikPlus is able to do SMILE at this time.  I am hoping that "all
> boats rise" when another laser vision correction surgery is being
> marketed in the area.
>
> As this is neither LASIK nor PRK it is not a violation of my
> obligation to you.  But I am letting you know my plans because I am
> trying to repair my relationship with you.  Please let me know by
> Noon on Tuesday, November 5, 2019 if you have any objections to
> me doing SMILE so that we can discuss this before I commit to my
> lease.

(Doc. 30-2 at PageID 609.)  Joffe forwarded Goel's email to LCA General Counsel, Kevin

Dineen, who emailed Goel saying:

> Your non-compete for laser vision correction services encompasses
> SMILE laser eye surgery. . . . As such, we do not agree with your
> interpretation and will take appropriate action in the event you
> decide to perform SMILE in the Restricted Area.

(*Id.* at PageID 608–09.)

At 5:50 p.m. on November 1, 2019, outside counsel for LCA became aware that Dineen

(an attorney) emailed Goel (who is represented by counsel) directly and notified Goel's counsel.

(Doc. 30-2 at PageID 608.)  LCA's outside counsel informed Goel's counsel, "I just became

aware of this and have instructed my client to have no further direct communication with Dr.

Goel."  (*Id.*)

Goel's counsel sought agreement from LCA's outside counsel that Goel could perform

SMILE surgery in the Restricted Area as the Consent Agreement barred only LASIK/PRK.

(Doc. 51-5 at PageID 1230–33.)  LCA's outside counsel refused to respond to that inquiry,

seeking only to ensure that Goel would submit to an interview and produce certain documents

4

related to VGH.  (*Id.*)  Goel then commenced performing SMILE procedures in the Restricted Area.

Meanwhile, unbeknownst to Goel or his attorneys, Joffe and Dineen discussed having a "secret shopper" call Goel's new offices "inquiring about LASIK – we may want to record the call and/or have him sign a written affidavit as to the discussion.  Let's p[r]ep him re Qs to ask, etc."  (Doc. 51-7 at PageID 1239–40.)  According to the email chain, Dineen noted that "under Maryland's Wiretapping and Electronic Surveillance Act, it is unlawful to record a phone conversation without the consent of both parties.  So recording the call is not a viable option." (*Id.* at PageID 1240.)  Although they considered whether Goel would recognize the potential "secret shopper" as an affiliate of LCA, no ethical concerns were raised concerning direct contact with a represented party or assuming a "secret" identity in contacting Goel.  (*Id.*).  LCA's outside counsel was copied on this email.  (*Id.* at PageID 1239.)

Over the next few months, again unbeknownst to Goel or his attorney, an LCA Legal Administrator, Alexa Dorning, created a "spoofed" telephone number with a Baltimore area code.  She used false names, addresses, and email addresses to contact Goel's office to elicit evidence that Goel would perform a LASIK pre-operative examination in the Restricted Area. Dorning made the calls on September 3, 2019, September 4, 2019, November 12, 2019, and February 14, 2020.  She intentionally mispronounced Goel's name and referenced online reviews during the calls to ensure her identity remained unknown.  She then emailed Dineen a "recap" of each call.  (Doc. 51-8 at PageID 1243–45.)  On at least one occasion, Dineen promptly forwarded the "recap" email to outside counsel who shared it with her law firm colleagues. (Doc. 51-9 at PageID 1247–48.)

On February 17, 2020, LCA filed a Motion for Contempt and Request for Expedited

Hearing (Doc. 30).  In its Motion for Contempt, LCA alleged that Goel violated the Consent

Judgment in three ways: (1) by performing SMILE procedures in the Restricted Area because

"SMILE is essentially 'small incision LASIK.'"  (Doc. 30 at PageID 579 (quoting Norden

Aff.).); (2) by performing SMILE pre- and post-operative examinations in the Restricted Area

because they are essentially the same as LASIK pre- and post-operative examinations; and (3) by

running radio and other advertisements in which the required disclaimers were not explicit and

prominent.

In support of its Motion for Contempt, LCA filed an affidavit of Alexa Dorning

(notarized by General Counsel Dineen).  (Doc. 33.)  Although Dorning's affidavit recounted her

February 14, 2020 conversation with Goel's office and the fact that she scheduled a pre-

operative consultation appointment she had no intention of keeping, it did not disclose the

"spoofed" telephone number, the false identity she assumed in making the call, or the other calls

she had made.  (Doc. 33 at PageID 794–95.)  In addition, she identified herself as a "Legal

Administrator" employed by LCA-Vision, Inc., but she did not disclose the role any licensed

attorneys played in making the questionable telephone calls.  (*Id.* at PageID 794.)

The Court scheduled an evidentiary hearing on LCA's Motion for Contempt for March

17, 2020.  However, as witnesses were reluctant to travel to Cincinnati due to the coronavirus

pandemic, the Court rescheduled the evidentiary hearing.  On July 22, 2020, Goel's counsel

notified the Court and opposing counsel of a potential ethical concern.  The Court conducted a

telephone conference with all counsel on July 23, 2020.

During the telephone conference, Goel's counsel informed the Court of his belief that

LCA General Counsel, Kevin Dineen, had engaged in unethical conduct by working with Alexa

Dorning to make "pretextual fake calls using essentially fraud to elicit testimony" from Goel's office on at least two occasions without Goel's or his attorneys' knowledge. (7/23/20 Transcript, Doc. 42 at PageID 1043.) The pretextual calls served as the bases for two Dorning affidavits submitted to the Court, one in support of LCA's Complaint and a second in support of LCA's Motion for Contempt. (Docs. 1-15, 33.)

After mediation with a Court-appointed mediator failed, Goel sought additional discovery related to the alleged unethical conduct and Goel's belief that LCA had knowingly made misrepresentations "to generate a claim against Dr. Goel that they knew they didn't have" and filed false information with the Court. (8/31/20 Transcript, Doc. 46 at PageID 1091–92.) In response, LCA offered to withdraw the Dorning affidavits and to provide certain attorney-client privileged emails to the Court for *in camera* inspection. (*Id.* at PageID 1109–10.)

On September 1, 2020, the Court received a package containing 22 email chains related to Dorning's affidavits. After *in camera* inspection, the Court provided four of those email chains to Goel's counsel as relevant to the alleged misconduct in this case.

On September 4, 2020, LCA filed a Notice of Withdrawal and Request for Hearing which stated, in its entirety:

> Consistent with its July 30, 2020 (Doc. 44 at 3:24–4:7) and August 31, 2020 (Doc. 46 at 3:24–4:5) representations to the Court, plaintiffs, LCA-Vision, Inc., d/b/a/ Lasik*Plus* and Columbus Eye Associates, Inc., hereby formally withdraw all allegations and arguments regarding, and evidence of, telephone calls made by Alexa Dorning to Goel Vision including, but not limited to, the Affidavits of Alexa Dorning in support of plaintiffs' Verified Complaint (Doc. 1-15) and Motion for Contempt (Doc. 33). Plaintiffs are prepared to present other, substantial evidence of defendant, Sanjay Desh Goel, M.D.'s contempt of the Court's Consent Judgment and Agreed Permanent Injunction (Doc. 26) and hereby respectfully request that the hearing on its motion be rescheduled forthwith.

(Doc. 48 at PageID 1132.)  LCA neither identified nor provided the "other, substantial evidence" of contempt.

Also on September 4, 2020, Goel filed a Motion for Sanctions (Doc. 51).  Goel attempted to obtain additional discovery related to LCA's alleged misconduct, and LCA filed a Motion to Confirm Stay of Discovery (Doc. 55).  All pending motions are now ripe for consideration.

## II.    MOTION FOR CONTEMPT

To ensure that judicial orders are "authoritative rather than advisory,"[3] courts possess inherent authority to punish "a violation of a court order by one who fully understands its meaning but chooses to ignore its mandate."  *Int'l Longshoremen's Ass'n, Loc. 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967).  "A party that seeks civil contempt sanctions must demonstrate by clear and convincing evidence that the opposing party knowingly 'violated a definite and specific order of the court.'"  *Gascho v. Global Fitness Holdings, LLC*, 875 F.3d 795, 800 (6th Cir. 2017) (quoting *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 591 (6th Cir. 1987)).  If a movant carries this "heavy" burden, "the onus shifts to the opposing party to demonstrate that it was unable to comply with the court's order."  *Id.* (citing *Elec. Workers Pension Trust Fund of Loc. Union # 58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 379 2003)).

A court's contempt power is a mighty weapon and must be exercised with caution. *Gascho*, 875 F.3d at 799.  "Contempt is a measure of last resort, not first resort."  *Id.*

In the case at bar, LCA bears the heavy burden of demonstrating by clear and convincing evidence that Goel violated the Consent Judgment.  It has failed to do so.

---

[3] *Gascho v. Global Fitness Holdings, LLC*, 875 F.3d 795, 798 (6th Cir. 2017).

### A. SMILE Procedures in the Restricted Area

LCA initially alleged that, by performing SMILE procedures in the Restricted Area, Goel should be held in contempt because "the Settlement Agreement and Court's Order require Dr. Goel to be out of the laser vision correction business in Baltimore and surrounding environs for 18 months." (Doc. 38 at PageID 1010; *see* Doc. 30 at 578–79 (arguing that "SMILE is essentially 'small incision LASIK.'").) LCA wisely appeared to abandon this contention later. (*See* Doc. 38 at PageID 1012–17 (challenging only Goel's pre- and post-operative examinations and post-settlement advertising).) Indeed, in responding to Goel's Motion for Contempt, LCA finally admitted, "While SMILE was not specifically prohibited by the first paragraph of Section 2 of the Consent Judgment, it was also not identified as a procedure that Dr. Goel would be able to perform under the revised non-compete in the second paragraph of Section 2."[4] (Doc. 54 at PageID 1921.)

Regardless of whether LCA's contention was abandoned, it fails on the merits. Both LCA and Goel were thoroughly represented by a cadre of experienced legal counsel in this and all related litigation. The underlying settlement agreement and the Consent Judgment and Agreed Permanent Injunction were heavily negotiated and involved several iterations before the final versions that prohibit Goel from "performing LASIK/PRK surgeries" in the specifically defined Restricted Area. (Doc. 26 at PageID 563.) There is no mention of removing him from

---

[4] LCA goes on to state, "With Dr. Goal [sic] having no experience, equipment or training in SMILE surgery, LCA read Dr. Goel's email as a 'gotcha.'" (Doc. 54 at PageID 1921.) The Court has trouble comprehending how Goel's transition to SMILE surgeries was perceived as a "gotcha." First, the Consent Judgment provides, "Nothing in this paragraph prohibits Goel from performing general ophthalmology exams or other non-LASIK/PRK surgeries, including corneal consultation, refractive lenses, cataract surgery, and posterior capsulotomy within the Restricted Area." (Doc. 26 at PageID 564.) The plain language of the Consent Judgment is open-ended and does not purport to list every procedure Goel could properly perform. Second, Goel did exactly what he was supposed to do after the settlement, i.e., pivoted his practice to focus on procedures that do not compete with LCA.

the "laser vision correction business." The Consent Judgment identified two specific surgical procedures in which Goel could not engage in the Restricted Area—PRK and LASIK.

Despite LCA's attempts to imply otherwise, SMILE is different than PRK and LASIK. The procedures require different types of lasers, and "[t]he FDA recognizes them as distinct novel procedures and requires companies to do unique clinical trials for approval." (Durrie Aff., Doc. 37-8 at PageID 945.) In addition, Goel performed only PRK and LASIK procedures for LCA as LCA does not perform SMILE procedures. (Goel Dec., Doc. 37-1 at PageID 837.) Indeed, LCA does not own the Zeiss VisuMax laser required to perform SMILE procedures, but Goel spent $250,000 on one to perform SMILE procedures at his Towson, Maryland office (inside the Restricted Area). The only excimer laser (for LASIK/PRK) to which Goel has access is in Frederick, Maryland (outside the Restricted Area). (*Id.*) Finally, LCA's website specifically differentiates LASIK (which it performs) and the "newly introduced," "novelty" SMILE (which it does not). (https://www.lasikplus.com/faq/does-lasikplus-offer-smile/ (last viewed on November 17, 2020).)

Accordingly, the Court concludes that Goel's performance of SMILE procedures within the Restricted Area in no way violates the Consent Judgment. If LCA contends otherwise, it has failed to demonstrate by clear and convincing evidence that the SMILE surgeries violate a definite and specific Court order.

### B. Pre- and Post-Operative Eye Examinations in the Restricted Area

LCA contends that Goel's performance of SMILE pre- and post-operative examinations in the Restricted Area warrants a finding of civil contempt. As recited more fully above, the Consent Judgment prohibits Goel "from performing LASIK/PRK surgeries, including pre-operative and routine post-operative LASIK/PRK exams" in the Restricted Area. (Doc. 26 at

10

PageID 563.)  However, "Nothing in this paragraph prohibits Goel from performing general ophthalmology exams or other non-LASIK/PRK surgeries."  (*Id.* at PageID 564.)

In its Motion for Contempt and related filings, LCA offered two sources of evidence that Goel violated this provision:  (1) the now-withdrawn Alexa Dorning affidavits; and (2) Goel's statement during a required interview with LCA's counsel[5] that "all eye exams are very similar . . . whether you're doing a glaucoma eye exam or a retinal eye exam, an eye exam is going to be an eye exam."  (Doc. 30 at PageID 587–88; Doc. 38 at PageID 1012–14.)  This evidence falls far short of the clear and convincing evidence that Goel violated a definite and specific court order required to support a contempt finding.

First, while the Consent Judgment prohibits Goel from performing "pre-operative and routine post-operative LASIK/PRK exams" except under certain circumstances, it specifically permits him to perform "general ophthalmology exams" in the Restricted Area.  (Doc. 26 at PageID 563–64.)  In addition, the Consent Judgment specifically allows Goel to discuss LASIK/PRK as an option for general ophthalmology patients and to refer patients for LASIK/PRK outside the Restricted Area as long as "the patient did not indicate the purpose of their requested evaluation," "Goel did not evaluate the patient within the Restricted Area with the purpose of performing a pre-operative LASIK/PRK correction examination," and "Goel does not perform the LASIK/PRK surgery or any associated evaluations, pre-operative, or post-operative exams within the Restricted Area."  (*Id.* at PageID 564.)

LCA's evidence of violation provides, in its entirety:

_____

[5] Although LCA claims that their relentless pursuit of Goel has nothing to do with VGH, LCA conditioned the settlement in this matter on Goel agreeing to be interviewed by LCA's outside counsel to "provide information to her (including all communications in every form with VGH, its affiliates, and [VGH executive Mark] Cohen . . . ) about his involvement with VGH and VGH's efforts to recruit Lasik*Plus* affiliated physicians."  (Settlement Agreement, Doc. 51-3 at PageID 1218.)

>MS. MITCHELL [LCA's outside counsel]:  Right.  When patients call in and they're interested in LASIK and they call the number on your website, what do your staff tell them?
>DR. GOEL:  We tell them that we can see them for a LASIK exam in Frederick [outside the Restricted Area] where I can do LASIK or we can see them for a SMILE exam, a SMILE laser eye surgery exam in my Towson or Columbia locations [inside the Restricted Area].
>MS. MITCHELL:  What is the difference between a preoperative exam for SMILE and a preoperative exam for LASIK?
>DR. GOEL:  Well, all eye exams are very similar, where you're going to do a complete examination of the eye and looking for pathology within the eye, and then doing a corneal topography to check the health of the cornea and the thickness of the cornea.
>MS. MITCHELL: It sounds to me that that's what you're describing as a SMILE exam?
>DR. GOEL:  That is a basic –
>MS. MITCHELL:  Sounds to me like a LASIK preop exam.  That's why I'm asking what the difference is between the two, if there is any.
>DR. GOEL:  Well, an eye exam is an eye exam.  I'm not sure you can – you know, whether you're doing a glaucoma eye exam or a retinal eye exam, an eye exam is going to be an eye exam.
>MS. MITCHELL:  Are there any different things that you have to look for to do SMILE that you don't have to look for when you do LASIK?  Any difference in what you do on a SMILE exam?

(Doc. 30-3 at PageID 659–60.)  At this point in Mitchell's interview, Goel's attorney objected to the questioning as outside the scope of his required interview.  (*Id.* at PageID 661.)  The attorneys then discussed the terms of the Settlement Agreement and ultimately agreed that Mitchell's line of questioning was outside the "language of the cooperation paragraph." (*Id.* at PageID 662.)  This exchange falls woefully short of establishing that Goel fully understood but chose to ignore a court mandate.  *See Int'l Longshoremen's Ass'n, Loc. 1291*, 389 U.S. at 76.  If, as LCA contends, "an eye exam is an eye exam," the Consent Judgment's prohibition of LASIK/PRK pre-operative exams while specifically permitting "general ophthalmology exams" lacks the clarity and specificity required to support a contempt finding.

To the extent that LCA implies that this exchange proves Goel is using SMILE exams as a pretext to conduct LASIK pre-operative exams in the Restricted Area, Goel's undisputed testimony indicates otherwise.  Specifically, Goel prefers to perform SMILE surgeries over LASIK/PRK because he performs those closer to his home and because he owns the VisuMax Laser used for SMILE (as opposed to paying rental fees for the lasers he uses to perform LASIK/PRK).  (Doc. 37-1 at PageID 837.)  In addition, Goel believes that SMILE yields similar results with less patient discomfort and downtime, even though he is "required by the Medical Code of Ethics to inform a patient of all possible medical and surgical alternatives to a SMILE procedure (or any surgery) for which they qualify," and he does "not even know what corrective options will be available to a prospective patient until after performing a full eye exam and completing certain tests on that patient."  (*Id.* at PageID 837–38.)

Second, although given multiple chances to do so, LCA has failed to present significant evidence—let alone clear and convincing evidence—of Goel's alleged contempt.  Indeed, once LCA admitted that the Dorning affidavits had been questionably obtained, the Court suggested denying the Motion for Contempt without prejudice so LCA could refile it without reliance on any Dorning affidavit.  (Doc. 44 at PageID 1079.)  Indeed, Goel's counsel specifically stated, during the conference with the Court, "Frankly, if they're pulling evidence, I'm not really sure what is even left as a motion anymore."  (*Id.* at PageID 1080.)  However, LCA's counsel twice refused the Court's invitation.  (*Id.*  at PageID 1080, 1081.)  In subsequently withdrawing the Dorning affidavits, LCA claimed it was "prepared to present other, substantial evidence" of Goel's contempt, but LCA failed to identify or produce such evidence.

### C. Advertisements and Social Media

As explained above, if LCA were able to carry the heavy burden of establishing by clear and convincing evidence that Goel violated a clear and specific court order, the burden would shift to Goel to establish that he was unable to comply. *See Gascho*, 875 F.3d at 800. In this case, the Consent Judgment prohibits Goel from "advertising, whether via radio, television, website, social media or other medium or in any of his practice locations, that he is able to perform LASIK/PRK surgeries, including pre-operative and post-operative LASIK/PRK exams, within the Restricted Area." (Doc. 26 at PageID 565.) However, the Consent Judgment expressly permits Goel to advertise that he performs LASIK/PRK and associated exams outside the Restricted Area as long as "any advertisements are explicit and prominent either that Goel is not performing LASIK/PRK in the Restricted Area or the location that Goel is performing LASIK/PRK outside the Restricted Area." (*Id.*) In addition, he is prohibited from advertising that he performs LASIK/PRK in "Baltimore," the "Baltimore Area," or any other location within the Restricted Area. (*Id.*)

LCA has established—at best—that Goel ran some advertisements to which LCA objected, and Goel either changed or discontinued them. Dr. Goel's website, goelvision.com, contains identifiers on each page indicating that he performs LASIK surgery and pre- and post-operative care only at his Frederick, Maryland location (outside the Restricted Area) and that he performs SMILE surgery, cataract surgery, and ICL surgery at his Towson and Columbia locations. In addition, under the "contact" tab where a potential patient may click an adjacent button to "Request an Appointment," the disclaimers are explicit and in a large, clear font. (https://www.goelvision.com/contact/ (last viewed 11/17/20).) Although LCA objected to Goel's social media activity, it also acknowledged that he changed his LinkedIn, Facebook and

Twitter pages in response to the objections.  (Doc. 30 at PageID 584.)  Again, LCA falls woefully short of establishing by clear and convincing evidence that Goel was ignoring a Court order.  Accordingly, the Court declines LCA's invitation to employ the "last resort" of finding Goel in civil contempt.

### III.     MOTION FOR SANCTIONS

Goel seeks sanctions from LCA pursuant to Federal Rule of Civil Procedure 11(b), 28 U.S.C. § 1927, and the Court's inherent authority.  Specifically, he claims that he is entitled to reimbursement of the attorneys' fees and costs incurred defending LCA's Motion for Contempt, to dismissal of the Motion for Contempt, and to Court-ordered depositions of Dineen, Joffe, Dorning, and outside counsel.  (Doc. 51 at PageID 1177.)

Pursuant to Rule 11(b), by presenting a motion to the court, an attorney certifies that the motion "is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation [and] the factual contentions have evidentiary support." Fed. R. Civ. P. 11(b)(1) and (3).  The Court applies an objective reasonableness standard in evaluating Rule 11 claims.  Specifically, "The focus here is narrow and concerned only with whether 'the attorney believes on the basis of reasonable inquiry that there is a reasonable basis in law and fact for the position taken and that the paper is not filed for an improper purpose.'" *Oakstone Community Sch. v. Williams*, 615 F. App'x 284, 288 (6th Cir. 2015) (quoting *Jackson v. Law Firm of O'Hara, Ruberg, Osborne and Taylor*, 875 F.2d 1224, 1229 (6th Cir. 1989)).

Pursuant to 28 U.S.C. § 1927, "Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

"Sanctions are appropriate under § 1927 'when an attorney has engaged in some sort of conduct that, from an objective standpoint, falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party.'" *Saenz v. Kohl's Dept. Stores, Inc.*, No. 20-1517, ___ F. App'x ___, 2020 WL 6393335, at *4 (6th Cir. Nov. 2, 2020) (quoting *Holmes v. City of Massillon*, 78 F.3d 1041, 1049 (6th Cir. 1996)) (internal quotation marks omitted). This standard—intended to deter dilatory litigation practices—does not require subjective bad faith, but "something more than negligence or incompetence must be demonstrated." *Oakstone Community Sch.*, 615 F. App'x at 289.

In the case at bar, there is ample evidence that LCA's conduct—and potentially that of its outside counsel—is sanctionable. On August 16, 2019, LCA CEO Joffe, in consultation with General Counsel Dineen, discussed candidates for a "secret shopper" to call Goel's new phone number using prepared questions to gather evidence that Goel violated his restrictive covenant. (Joffe Email, Doc. 51-7 at PageID 1239–40.) They copied LCA's outside counsel on the email. (*Id.*) On September 5, 2019, Dorning, a Legal Administrator at LCA, emailed Dineen recounting her creation of a "spoof caller ID with a 410 area code" to contact Goel's office to obtain evidence for use in an affidavit. (Dorning Email, Doc. 51-8 at PageID 1243.) Less than three weeks later, LCA filed the instant action, offering a very brief affidavit of Alexa Dorning in support. (Doc. 1-15 at PageID 232.) On October 28, 2019, the parties settled the case, and provided the Court with the Consent Judgment and Agreed Permanent Injunction, which the Court signed. (Doc. 26.)

Two weeks later, Dorning again emailed Dineen recounting in more detail another incident in which she used a "spoofed" phone number to contact Goel's office, providing false information taken from a review on Goel's Facebook page to make a phony appointment for "an

16

all-comprehensive eye exam." (Dorning Email, Doc. 51-8 at PageID 1244.) Dineen immediately forwarded Dorning's email to LCA's outside counsel, Jennifer Mitchell, saying, "Let's discuss." (Dineen Email, Doc. 51-9 at PageID 1247.) Rather than objecting to the deception or to contacting Goel's office without consulting his attorney, Mitchell forwarded the email to law firm colleagues, saying, "Of course this is what he is doing. . ." (Mitchell Email, Doc. 51-9 at PageID 1247.)

On February 14, 2020, Dorning made yet another questionable phone call to Goel's office again without consulting Goel's attorneys and again immediately sent Dineen a "recap" email. (Doc. 51-8 at PageID 1245.) Goel's employee told Dorning—falsely believing she was speaking with an actual client—that Goel would not do LASIK at his Baltimore office, but she recommended SMILE surgery and that could be done in Baltimore. (*Id.*) When Dorning falsely said she had read online about people committing suicide after having SMILE surgery, the employee "laughed and reassured me that SMILE is not at all like what I've read about [and] [s]he encouraged me to discuss it with Dr. Goel and told me that he does about six different types of procedures and that I could discuss options with him during my exam." (*Id.*) Three days later, LCA's outside counsel filed the instant Motion for Contempt and offered Alexa Dorning's affidavit in support. (Doc. 33.) In this affidavit, notarized by Dineen, Dorning recounted her conversation with Goel's employee, but she failed to mention the "spoofed" phone number, the previous calls, or the other phony information provided. (*Id.* at PageID 794–95.)

Seven months later, in responding to Goel's Motion for Sanctions, LCA acknowledged:

> While Dorning's decision to use a pseudonym was improper and misguided, Dorning was never instructed by Joffe, Dineen or LCA's counsel to take this approach. There was no "scripting" to Dorning, as Dr. Goel argues. With the benefit of hindsight, all are in agreement that these calls should not have occurred.

(Doc. 54 at PageID 1926.)  LCA appears to blame Legal Administrator Dorning for the "improper and misguided" calls rather than looking to the cadre of attorneys—both inside and outside of LCA—who consulted with her throughout this process, drafted and notarized her affidavit, filed the Motion for Contempt, and continue to show no ownership or contrition to this day.  While simultaneously blaming Dorning and contending Goel should have caught them sooner, LCA states that the "LCA attorneys involved in the Dorning affidavit have self-reported the potential ethical issue, triggering a confidential investigation in accordance with the mandated process."  (Doc. 54 at PageID 1931.)  However, the Court has no information regarding who self-reported what to whom.

Goel alleges that Dorning's actions violate federal law[6] and that the lawyers[7] involved violated the Ohio Rules of Professional Conduct, specifically Rules 1.2 (prohibiting a lawyer from assisting a client "in conduct that the lawyer knows is illegal or fraudulent"), 4.1 (requiring a lawyer to disclose material facts when necessary to avoid assisting client in illegal or fraudulent act), 4.2 (prohibiting most direct communications with represented parties), and 8.4 (prohibiting a lawyer from engaging in dishonesty or misrepresentation or assisting another in violating the Ohio Rules of Professional Conduct).  However, those determinations are more appropriately made by other authorities.

Both parties rely heavily on a prior case decided in this Court, *Curatola v. American Electric Power*, No. 1:06-cv-839, 2008 WL 2120840 (S.D. Ohio 2008).  In *Curatola*, the defendant's attorney sought to determine ownership of Curatola Construction Company and

---

[6] Dorning's use of "spoofed" telephone numbers, according to Goel, violates the Truth in Caller ID Act of 2009. (Doc. 51 at PageID 1172.)  Pursuant to 47 U.S.C. § 227(e)(1), "It shall be unlawful for any person within the United States . . . to cause any caller identification service to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value," except under circumstances not applicable here (e.g., law enforcement investigation or court order).

[7] It is undisputed that CEO Joffe is a non-practicing attorney.  General Counsel Dineen and LCA's outside counsel are all licensed, practicing attorneys.  Dorning is not an attorney.

instructed a private investigator (who had been monitoring Curatola and his family) to "contact Curatola Homebuilders."  *Id.* at \*1.  The investigator posed as a homeowner considering home renovations and "accidentally" met with Curatola and his father to discuss the renovation.  *Id.*  Curatola later discovered that the "client" was actually a private investigator and reported to his attorney "that someone was harassing him and his family members by following them and attempting to contact them."  *Id.*  Approximately three weeks after the improper contact with Curatola, the defendant's attorney self-reported the ethical violation to the Cincinnati Bar Association, confirmed to the plaintiff's attorney that inappropriate contact had occurred, agreed not to use any evidence obtained from the improper meeting, and made the investigator available for deposition at the defendant's expense.  Unsatisfied with those actions, Curatola asked the Court to strike the defendants' answer or grant summary judgment to Curatola on medical causation.  Finding the requested sanctions "too harsh a response" to the improper actions, the Court imposed the lesser sanctions of excluding the evidence obtained through improper contact, ordering no further investigation of Curatola or his family, and producing all evidence obtained improperly.  *Id.* at \*3–4.

In this case, Goel argues, LCA attorneys went beyond the improper conduct in *Curatola* because the improper contact with Goel was "intentional, deceptive, repetitive, and specifically designed to elicit binding admissions to be used against Dr. Goel by experienced attorneys [as] opposed to a private investigator."  (Doc. 51 at PageID 1176.)  In sharp contrast, LCA contends, "Once LCA became aware of the ethical rules implicated by Dorning's phone calls, it followed each step outlined in *Curatola* — it immediately withdrew Dorning's affidavit without waiting for a Court order; and its attorneys retained ethics counsel and self-reported facts to Disciplinary Counsel."  (Doc. 54 at PageID 1927.)  Neither side is entirely correct.

Unlike in *Curatola*, the deceptive calls in this case did not result in communications with Goel directly (although that appears to be a fortuitous coincidence), and there is no allegation that LCA had Goel or his family members followed in any way.  However, the Court is troubled by LCA's continuing lack of remorse and ongoing efforts to imply that Dorning devised this scheme on her own while the attorneys played no role in her actions or in submitting misleading evidence and arguments to this Court.  (Doc. 54 at PageID 1926.)  As emails between Joffe, Dineen and outside counsel readily establish, Joffe and Dineen sought a "secret shopper" before Dorning's name appears anywhere in this matter.  (Doc. 51-7 at PageID 1240.)

Similarly offensive is LCA's claim that "Once LCA became aware of the ethical rules implicated by Dorning's phone calls, it followed each step outlined in *Curatola* — it immediately withdrew Dorning's affidavit without waiting for a Court order; and its attorneys retained ethics counsel and self-reported facts to Disciplinary Counsel."  (Doc. 54 at PageID 1927.)  The undisputed facts demonstrate otherwise.  First, outside counsel was copied on the initial "secret shopper" email dated August 16, 2019.  Second, Dineen immediately forwarded to outside counsel Dorning's "recap" emails in which she detailed the false telephone number, the pseudonyms, and the multiple lies she told in making the calls.  (Doc. 51-9 at PageID 1247–48.)  Outside counsel then circulated the "recap" emails to others at her law firm.  (*Id.* at 1247.)  Rather than raising concerns about possible illegal activity or potential ethical violations, the other attorneys at the firm made comments such as, "Brazen as hell" and "you will have a field day with this guy."  (*Id.*)  Third, outside counsel—not Dorning—submitted to the Court two separate Dorning affidavits in which Dorning discussed the calls but never disclosed the multiple deceptions employed in placing the calls.  (Doc. 1-15 at PageID 232, Doc. 33 at PageID 794–95.)

Outside counsel filed these misleading affidavits on September 25, 2019 and February 17, 2020.  Yet, the Dorning affidavits were not withdrawn until September 4, 2020, three days after the Court provided Goel's attorney with the emails between LCA and outside counsel and almost a full year after outside counsel filed the first Dorning affidavit in support of its Complaint in this matter.  Unlike in *Curatola*, the Court does not find the withdrawal to be "immediate" and outside counsel has been deliberately glib about "self-reporting."[8]

The unprincipled behavior here is disappointing at best and fraudulent at worst. "Nonetheless, although these actions might have been 'unprofessional and serious enough to meet the standard for imposing sanctions,' we choose to 'exercise our discretion not to sanction' counsel." *Saenz*, No. 20-1517, 2020 WL 6393335, at *5 (6th Cir. Nov. 2, 2020) (quoting *Williams v. Shelby County Sch. Sys.*, 815 F. App'x 842, 846 (6th Cir. 2020)).  Although belatedly, LCA wisely chose to employ reputable ethics counsel and then followed his advice. LCA withdrew the offending affidavits voluntarily and appears to have ceased its questionable conduct.  However, LCA and its outside counsel are hereby notified that any further misleading or improper behavior in this matter will result in significant and immediate repercussions up to and including payment of Goel's attorneys' fees and costs.

## IV.   MOTION TO CONFIRM STAY OF DISCOVERY

LCA filed a "Motion to Confirm Stay of Discovery" asking this Court to "formally confirm the stay of all discovery pending its decision" on Defendant's Motion for Sanctions. (Doc. 55 at PageID 1935.)  As the Court never entered an order staying discovery, there is nothing to "confirm."  However, because the Court has resolved the sanctions motion, LCA's

---

[8] The Court agrees with LCA on one point, however.  Attorney David Kamp's appearance as "ethics counsel" seems to have precipitated LCA's decision to withdraw the Dorning affidavits.

discovery motion is now moot.  Both Goel and LCA have wasted significant time and resources in this matter, and they would be well-served to avoid further litigation.

## V. SEALED DOCUMENTS

Over Goel's objection, the Court orally granted LCA's request "that these briefings be filed under seal until the Court has an opportunity to review them and sort of triage."  (Doc. 46 at PageID 1105–08.)  The Court has now fully and exhaustively reviewed all filings in this matter and concludes that LCA has failed to carry its burden of overcoming the "'strong presumption in favor of openness' as to court records."  *See Shane Group, Inc. v. Blue Cross Blue Shield of Michigan,* 825 F.3d 299, 305 (6th Cir. 2016) (quoting *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1179 (6th Cir. 1983)).  Accordingly, all documents filed in the Court record must be unsealed.

## VI. CONCLUSION

For the reasons discussed above, LCA's Motion for Contempt (Doc. 30) is **DENIED**. Goel's Motion for Sanctions (Doc. 51) is **DENIED**.  LCA's Motion to Confirm Stay of Discovery (Doc. 55) is **DENIED AS MOOT**.  The Clerk is **ORDERED** to **UNSEAL** all documents filed under seal in this matter.

**IT IS SO ORDERED.**

S/Susan J. Dlott
Judge Susan J. Dlott
United States District Court